maintained in order to fulfill his very basic needs for a place to live, eat, sleep, bathe, so on. Nearly every drug defendant brings some work home with them, but the enhancement is not for the collateral uses that drug defendants make of homes that they would be maintaining anyway. In fact, even significant use of a home for the drug trade is not sufficient. The enhancement only applies where the drug distribution activity has become at least as important a purpose for having the space as the basic need for a home. Can you just tell us how the district court went wrong in interpreting the guideline? Because it seemed to me that the district court interpreted it exactly as you wanted, and that maybe you're quibbling with or finding a fax, but I'm not sure. Sure, Your Honor. So I think, I mean, I think, well, to get into that, I kind of need to say what I think principal or primary means, because the district court does go ahead and say principal and primary, but I don't think it's enough for the court to say just the magic words. It actually has to give meaning to those words that, you know, fits the meaning that those words have. It, in order, so we know from the Mancuso case, from Shetlar, that significance is not enough, right? That in Mancuso, for instance, this court reverses a conviction under 21 U.S.C. 856, which is the companion statute, with this nearly identical language because the jury was instructed significant purpose, and, but what's required is principal or primary, and for me, the difference between principal and primary, and on the one hand, and significant on the other, is really this idea of a comparison. You can look at a stack of something and say, oh, that's a significant amount of this or that, but if you want to talk about something principal or primary, those are comparative superlatives. They mean, both of them mean first or highest in rank and importance, and so you can't really be first in importance without looking at what the other options are, and so if the drug purpose is significant, but less important than another use, like residential use, it can't be a primary purpose, it can't support the enhancement. Let me ask you, this is, here's a hypothetical, so understand it's a hypothetical, although there are, there's some truth to it. The woman across the street from me runs an exercise business out of her garage, and so from like nine to six, they're doing, I don't know what it is, but they're doing something over there, right? Okay. And so cars are coming and going, and people are coming in and out of their garage, but it's their home garage. Now, she lives in the house, but there's a lot of activity, I don't think it's drug activity, I think it's exercise activity, but there's a lot of activity out there. If someone were to ask me, well, what's the purpose of her house, I would say, well, I don't know. I'd say, I think she lives there, but boy, there's a lot of traffic, there are a lot of people exercising in that house. So use that example. What would that be? What I see in your hypothetical is someone who's, in some sense, compromising the residential purpose of their house in favor of this exercise purpose, as opposed to drug purpose, but they've turned their garage over to that purpose. I assume they have some equipment in there. It's not going to be used for resident, like that, you know, a premise can be an enclosure or a room, right? So they've kind of taken their garage and turned it into an exercise. Now, sometimes they park the cars in there too, but fair enough, I see where you're going. So you think in that situation that they've kind of commandeered the house in a way that did not happen in this case. Right. And I mean, you're describing like daily constant activity, which again, is not something we see in this case. In this case, you see a drug sale, I think they had 54 over 28 months, which is one every, a little less than one every two weeks. So it's, you know, to me, you're describing a situation where, yes, this has really become a big purpose of the house. I don't know if it's primary principle, but it's certainly closer than this one is. Well, can I ask you about that? Because even in an example that Judge Owens gave, even then, if I knew that the person lived in the house, I would still have trouble saying that the, no matter how much they're exercising, you'd still think, well, the primary purpose has got to be living there. So if that, if you kind of think of it that way, then under your test, where you're just rank order things, when would it, when would a home ever be, ever fit the guidelines? Sure. And I agree with you that it is, it is a high bar because like living in a place is, I mean, it's such a fundamental human need. We all need a place to live. So it should be a high bar, but, but there are certainly cases that reach it. I think the, the Florence Elagway case, which the Seventh Circuit case that the government cites, that's a good example that there, the defendant totally compromised the residential purposes of his home. He puts no limit on the use of the house for drug distribution. He's selling daily out of the house. He's selling only from that location. I think importantly, when his drug associates come over, he's forcing his wife and son to hide in his son's room. So he's, he's taking certainly their residential use of the home. Even in that circumstance, if he's sleeping there, he's sleeping there daily. He's presumably making coffee and meals and all this. And so it just seems to me, it'd be hard to say in some abstract theoretical sense that, that, that it's still more than the residential use of the home. So it seems like those kinds of cases would seem to support that you can have multiple primary or purposes. You certainly can have multiple primary purposes. So I'm not saying it has to be greater, but it has to, I mean, it has to be on the same level. And, and I mean, if he's again, forcing his wife to, to cower in a room while his drug associates are there, and that's happening on a daily basis, his wife's not getting the, the residential use of her home. So essentially, the, the, the drug dealing is as much as he is sleeping or eating or whatever. Exactly. That, that's how I'm thinking of it. And then just to give another example, the Shetler case, which is an 856 case, but again, it's the same standard. There the defendant turns his garage into a meth lab. He makes an enclosure in the garage, you know, installs a meth lab in there. The garage is no longer. So he's taken that space. I mean, the rest of the house, who knows, but he's taken that space and turned that piece of his, his property, that premises into a meth lab. So it's where he's made a dedicated space out of it. The rest of the family home may still be for living, but there is a premises in the family property that is for drugs. And you don't see anything like that here. Yeah, that makes that there, I think you could say, well, you definitely have, you know, you're using 24 hours a day as a meth lab when you're sleeping eight hours a day or something. So that, but other, but manufacturing, I suppose, but as far as the distribution aspect of it, it's, I have trouble thinking that I guess maybe some people only sleep three hours a night and maybe they deal, you know, 15 hours a day. I don't know, but it just, it seems to me most of the time, it'd be tough to say one is actually greater. Again, I think it's tough. I mean, I'll point to another case, I think Johnson from the Sixth Circuit and in pointing these cases, I'm not, their discussions of the standards in the other circuits are different from here because they have, they have a different conception of significant versus principal primary. But just the facts of that case, that guy had like a three bedroom house and he just turned one of those bedrooms into a space to keep 250 pounds of marijuana and a gun and some other stuff. So it's, you know, that entire bedroom is like the drug bedroom. That's, you know, off limits to non-drug visitors and that's, again, just not something you see here. Do you want to reserve? I would. Thank you. Good morning, Your Honors. May it please the court, Kelly Ng on behalf of the United States. Getting to Judge Thomas's question that she first asked to COLA, the district court cited the correct standard here and that is why it did not legally err. It, it cited the standard that distributing a controlled substance must be one of the defendant's primary or principal uses for the premises. And after raising the correct standard, it found that there was ample and substantial evidence in the record supporting that enhancement and then listed those facts. The district court also did not abuse its discretion when weighing the voluminous record in finding that that record supported the enhancement. And even if this were, this court were to adopt this frequency, this numerical frequency analysis that the defendant is putting forth, then defendant's use of the premises would still meet that standard. In this case, determining whether a drug premises enhancement applies, it is a very fact-intensive inquiry and it is clear that the district court in this case grappled with those facts. It said numerous times throughout the hearing how extensive the government's record was. There was about 700 pages of materials that it said that it had to digest and it listened to arguments for about two and a half hours. And, and one of the, what defendant was focusing on right now is about the actual number of transactions and that is important too, but it's important here that that first sentence in the guidelines commentary also says storage for the purpose of distribution is, is something that is to be taken into consideration. And here we can look at defendant's own admissions. For example, at PSR 583, defendant admitted that the safe in his bedroom closet was primarily used to store drug, drugs and drug proceeds. He also admitted that the 13, at PSR page 583, that the drug, the $13,000 were drug proceeds. And, and looking at the, the district court didn't just look at the criminal livelihood or the, the time that he had been a drug dealer. It looked at the actual drugs found in defendant's bedroom. He had approximately 687 fentanyl pills that were disguised as prescription M30s. He had about 458 grams of cocaine, which is about a pound of cocaine. He had approximately 374 methamphetamine pills that were disguised as Adderall. He also had the tools that he had, the 788 can, grams of cannabis flower. And he also had the tools of the trade in his bedroom, which the district court considered. He had the digital scales with residue. And Mr. Ticola admitted at PSR page 583 that he, he would use his bedroom to break apart drugs. And that's why he had the scales with residue in there, as well as the and one for, for regular use that sometimes fled into drug dealing. And there's no evidence in the record that he stored his drugs anywhere else other than his home. So if just, just relying on the storage aspect, if somebody was very, you know, very disciplined and did all their dealing out of their house, but, you know, use their house just for storage, you know, had a closet where they, would that be enough to meet, to meet this enhancement if they were just using it for storage? It would depend on the facts. And for example, if, if you're also considering whether they would use, they would maybe cut drugs in their bedroom, break apart drugs in their bedroom before just, just storage only that would. I mean, they are helping with distribution, I guess, cause you got to store it somewhere, but I'm just wondering where does that, does that make it a primary use? Well, this case has much more than that. We would agree that under the guidelines commentary that that fits because that first sentence in the guidelines commentary does state that that includes storage for the purposes of distributing a controlled substance. And if that's prime, that's one of the defendant's primary or principal uses for, for the premises, because in that case, is there any evidence that there's anywhere else that they could have stored drugs? But if that's what they're using the home for, if the home is a hub for drug trafficking activity and that's what makes it possible to continue distributing drugs, then, then it's possible. But again, on the facts of this case, we have so much more than that. In addition to him admitting that he's continuously storing drugs there for an extended period of time, the government listed out numerous examples where he either is distributing controlled substances from his home, inviting people to come to his home for drug transactions or to pay off debts when he is not home. That's the important part because drug trafficking can still continue in his absence because in the record, in the text messages that the district court considered is that he would rely on his roommates to either leave drugs out for him when he was not there. Sometimes he would also leave drugs out in, in the porch or in the back porch, in a shoe. And he would even note that there were, he would tell his customers to, to be sly by going to the back porch because the neighbor's kids were outside. That's- And counsel, if I could just jump in, my understanding is part of the reason why the statute, not the guideline, but the statute was passed and the guideline followed was because there were documented cases where drugs were being held in homes and children got access to these drugs. I had a case back in August where an infant died from ingesting drugs that were kept in the house. So I would think, if we go back to why the statute was passed, and again, there's legislative history or there's plain text, we can, we don't need to do that in this case. But I guess my point is that if the purpose of this law or the guideline was to prevent children and families from being accessing narcotics or being robbed, people coming to steal the drugs and kids there, that having drugs in a home is inherently more dangerous. And so it seems to me to, not to answer the question, but I will, maintaining the drugs, maintaining the drugs, it would seem to be is essential. I mean, if you keep the drugs in the house, it almost seems that that alone would satisfy the guideline because the purpose of it is to prevent children from ingesting the drugs or being, having people do a home invasion and there being children in the house. I mean, am I right about that? We agree, your honor, that that was part of the purposes of passing this is to protect children and the inherent danger to the community that maintaining a drug premise brings with that. And there were numerous people that came to defendant's home to complete drug transactions and there were kids next door. So that is, that is concerning. Nobody wants their kids living next door when random drug customers go to the backyard to pick up drugs from a shoe. And in this case, again, he had lots of different types of drugs in his bedroom so that there's an inherent risk of danger that can bring to any community in case anyone wanted to steal drugs from his apartment. As the district court noted that he had a variety of drugs in his bedroom that made him basically more marketable to a variety of different people in the community. And certainly with drugs like fentanyl, a small amount can kill someone. So if kids have, kids who are playing next door can potentially have access where it's in the back porch, it's hidden in the barbecue, it's in the front porch on a stand, it's easily accessible. And that's something that that could, that just creates more danger to the neighborhood. And inconceivably, if you turn the apartment over to someone, you're not cleaning it all out of the fentanyl that might be inside. So, I mean, anyway, you got two minutes? Does the court have any additional questions? I don't think so. Well, I will take the court's instruction at the very beginning. Well, hold on, hold on. It was advice, not instruction now. But fair enough, counsel. Thank you. Thank you, your honors. Does the court have any questions or should I jump in? Okay, a few things. I mean, the government counsel mentioned comparison. One issue here is that I don't think the district court did a comparison. The only mention the district court makes of the residential purposes is this very dismissive language about the only lawful purpose I've heard is that he lived there these premises, as if that's not a big deal. And then it never returns to that fact or we never see, well, I've waited out and on balance, you know, these are matching those. In terms of the drugs and scales in the home, that kind of stuff, he's really taking over small portions of his closet. I think there might have been a couple things in a desk drawer. There's no sense that the bedroom was compromised as a bedroom, that he had trouble using the bedroom as a bedroom because he's doing this. And just pushing back a little factually, we're not talking about numerous people in and out. It's a few, I mean, it's not ideal, but it's a few trusted customers. This isn't a constant stream of people. It's 54 instances over 28 months. Some of them are double counted as we talk about. And it's the same players again and again, not a random stream. Okay. All right. Thank you. Thank you very much. Thank you both for your briefing and argument in this very interesting case. We appreciate your efforts here. This matter is submitted.
judges: OWENS, VANDYKE, THOMAS